375 F.2d 539
 Larry GAULT, Plaintiff-Appellee,
v.
POOR SISTERS OF ST. FRANCES SERAPH OF the PERPETUAL
ADORATION, INC., a Corporation Organized and Existing under
the Laws of the State of Indiana, doing business in
Tennessee as St. Joseph Hospital, Sister Bernadine,
Administrator, Defendant-Appellant.
 No. 16839.
 United States Court of Appeals Sixth Circuit.
 March 30, 1967.
 
 Newton P. Allen, Memphis, Tenn., Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., on the brief, for appellant.
 James F. Schaeffer, Memphis, Tenn., for appellee.
 Before O'SULLIVAN, EDWARDS and McCREE, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 Defendant, an Indiana corporation doing business as St. Joseph Hospital in Memphis, Tennessee, appeals from a jury verdict rendered in favor of plaintiff in the sum of $162,500. Plaintiff had alleged he had suffered serious and permanent injuries while a patient in defendant's hospital as the result of defendant's negligence in administering a solution of 10% sodium hydroxide (instead of an .85% saline solution) into plaintiff's stomach.
 
 
 2
 Plaintiff's complaint alleged, and his testimony at trial tended to prove, that the sodium hydroxide burned the lining of his stomach, intestinal tract, esophagus, nose and mouth causing him to be hospitalized for 19 weeks, to lose weight from around 130 pounds down to 88 pounds, suffer major surgery involving the removal of a portion of his stomach, suffer drug addiction as a result of administration of pain medicine, suffer constriction of the esophagus which occasions frequent vomiting and periodic mechanical dilation of the esophagus, suffer substantial loss of wages and incurlarge hospital bills, and suffer permanent disabilities which one doctor estimated at 30% to 35% of his total bodily function.
 
 
 3
 Appellant claims that the District Judge erred in denying its motion for new trial because 1) there is no evidence in this record to sustain a negligence verdict for plaintiff; 2) there is no evidence of permanent injury and the verdict is based on speculation and is grossly excessive; 3) the jury was guilty of misconduct, was subjected to extraneous influences, and its verdict was a product of passion and prejudice. We shall discuss these issues under three headings: 'Negligence,' Amount of Verdict,' and 'The Jury's Deliberations.'
 
 NEGLIGENCE
 
 4
 Plaintiff's complaint and the evidence he adduced to support it tended to indicate that his injuries occurred during a gastric cytology test from the administration, by sheer mistake, of a caustic solution which was searing to human tissue and potentially lethal. The testimony tended to establish that the mistake was made because the sodium hydroxide solution and the normal saline solution were kept in the same low cabinet in bottles of identical shape and color.
 
 
 5
 Defendant's evidence tended to dispute the conclusion that any mistake was made at all. It tended to blame the events of March 27, 1964, on plaintiff's previously existing medical problems, including the possibility of a hiatus hernia and a stomach ulcer. DefendantS evidence also tended to minimize the claimed permantent effects of the injury.
 
 
 6
 Some of the significant evidence which the jury had a right to believe follows. The discharge summary prepared by a staff physician of appellant's hospital and read into the record at trial will serve to give a brief history of the events following plaintiff's admission to St. Joseph Hospital on March 22, 1964:
 
 
 7
 'Q. Would you read the discharge summary?
 
 
 8
 'A. (Reading) 'This twenty-year-old male was admitted because of pain across the sub-xiphoid area radiating into the left chest which was worse with deep breathing and after meals but constantly present to some degree and had several severe attacks in the middle of the night. He also complained of much belching, gas and indigestion and also complained of some difficulty swallowing solids. He had been in the hospital previously in December, 1963, at which time GI and gallbladder series revealed no evidence of hiatal hernia or ulcer. However, the symptoms had continued and he was re-admitted for further workups. His case has been discussed with Dr. Van Fossen, and she suggests admission for possible esophagoscopy and gastroscopy. Following admission a chest, GI and gallbladder were done which revealed fair visualization of the gallbladder but a stone could not be excluded. There was questionable deformity of the duodenal cap on GI series, so re-check x-rays were ordered for the following morning. Re-check spot films of the duodenum showed no evidence of ulcer. Gallbladder revealed excellent function with repeat does of dye. His admission lab work was within normal limits other than for an elevated white count-- 13,100 with 70 percent segs. After the x-rays a gastric analysis was ordered by Dr. Van Fossen along with x-rays of the spines, on 3-24. On 3-26 Dr. Van Fossen ordered gastric cytology. At this time it was stated that a caustic substance was instilled into the stomach and that the patient regurgitated this material with burning of the mouth and throat and upper GI tract. At this time treatment was instigated by Dr. Van Fossen, and she and Dr. N. E. Rossett followed the patient for the rest of his hospital stay. Any further comments on treatment would be from their records on the chart. Discharge diagnosis was corrosive esophagitis and gastritis secondary to caustic substance in the stomach and esophagus.' That is signed by Dr. Glen Head.'
 
 
 9
 Plaintiff's own testimony on the crucial episode concerned follows:
 
 
 10
 'Q. After she inserted the tube, did she leave the room, or was she prepared fully at that time to proceed with the test?
 
 
 11
 'A. I am sure she left the room at that time. I assumed to get more supplies.
 
 
 12
 'Q. Now, tell us what happened.
 
 
 13
 'A. She came back, and she had a flask-like thing with her then, and she then began to put that into my stomach, the contents of the flask into my stomach, and immediately after she put it into my stomach it felt like someone had dropped a blow torch in the bottom of my stomach, and I started getting sick at my stomach, and I jerked the tube out of my nose, and I don't know whether I asked her-- I made her somehow realize that I wanted something to throw up in, and she pushed a can over to me, and I threw up, and immediately when I threw up, I noticed that it was blood and mucus, and I threw up two or three times possibly, and lay back on the bed and hit the wall and hollered, 'Oh, my God, why?', and I remember the look on her face. I was looking at her, thought maybe she might give me something to help me, and she just looked bewildered like this never had happened before, or she didn't know what had happened, and then she left and then came back, and later the nurse's aide from the 2nd floor came up to get me.
 
 
 14
 'Q. Mr. Gault, do you know how long you were there alone after Mrs. Geiger had left the room?
 
 
 15
 'A. No, sir. At that time, time wasn't important to me.
 
 
 16
 'Q. Did you vomit any more while she was gone, while you were waiting?
 
 
 17
 'A. Yes, sir, I vomited.
 
 
 18
 'Q. Now, Mr. Gault, when you saw that you were vomiting blood, did this give you any concern?
 
 
 19
 'A. Yes, sir, it did. It upset me. I knew in my mind-- I knew at the moment that it wasn't right, that it couldn't be right, because Dr. Van Fossen had told me it was going to be washed out with salt water, and I knew at different times with sore throat as I had gargled salt water and swallowed some of it, and it never had made my stomach hurt like it was hurting then, and burn.'
 
 
 20
 The medical technician who administered the fluid by stomach tube and syringe (and who was eight months pregnant at the time) testified under crossexamination as follows:
 
 
 21
 'Q. Mrs. Geiger, what happened during the performance of the test?
 
 
 22
 'A. When I put the first solution down, the patient complained of a burning sensation.
 
 
 23
 'Q. And then what did the patient do?
 
 
 24
 'A. After that, he jerked the tube out and began to throw up.
 
 
 25
 'Q. What?
 
 
 26
 'A. Throw up. He just began to throw up.
 
 
 27
 'Q. What did the consistency of the vomitus to you appear to be?
 
 
 28
 'A. I didn't examine the consistency of the material.
 
 
 29
 'Q. Now, did you have occasion to go back to the cabinet again after you had found that something had gone wrong?
 
 
 30
 'A. I went back and tasted a little of the solution, and it tasted strange, so I went back to see.
 
 
 31
 'Q. What do you mean by it tasted strange?
 
 
 32
 'A. It tasted different. I have never tasted any of either onte of them but--
 
 
 33
 'Q. Did it burn?
 
 
 34
 'A. It had a tingling sensation, I would say.
 
 
 35
 'Q. Did it burn?
 
 
 36
 'A. I believe it did.
 
 
 37
 'Q. It burned?
 
 
 38
 'A. Yes, sir.
 
 
 39
 'Q. Now, you then had occasion to go back to the cabinet later?
 
 
 40
 'A. Yes.
 
 
 41
 'Q. That's what I am getting at. You did go back to the cabinet from which you got the jug?
 
 
 42
 'A. Yes, sir.
 
 
 43
 'Q. Did you look at the spot from which you had gotten the jug?
 
 
 44
 'A. Yes, sir.
 
 
 45
 'Q. Did you see a jug there?
 
 
 46
 'A. Yes, sir.
 
 
 47
 'Q. Did you read the label on that jug?
 
 
 48
 'A. Yes, sir.
 
 
 49
 'Q. What did it say?
 
 
 50
 'A. There were two jugs side by side and one was sodium chloride and the other one sodium hydroxide.
 
 
 51
 'Q. Now, let me show you another photograph, and I will ask you if that photograph similarly, as did the previous one relative to sodium chloride, fairly and accurately depict the kind and character and label of the bottle that you saw that day which contained sodium hydroxide?
 
 
 52
 'A. Yes, sir.'
 
 
 53
 The report of the St. Joseph's intern who first responded after the event said:
 
 
 54
 'Q. * * * Do you see an entry there by Dr. Mihalovits?
 
 
 55
 'A. Yes, sir, I do.
 
 
 56
 'Q. Would you give the date of that entry?
 
 
 57
 'A. 3-27-62, 8:00 A.M.
 
 
 58
 'Q. '62?
 
 
 59
 'A. I mean '64.
 
 
 60
 'Q. At what time?
 
 
 61
 'A. 8:00 A.M.
 
 
 62
 'Q. Would you read the entry on the record?
 
 
 63
 'A. (Reading) 'Patient was given 50 cc's ten per cent NaOH.'
 
 
 64
 'Q. Do you know that to be the chemical formula for sodium hydroxide?
 
 
 65
 'A. Yes, sir. (Continuing to read.) 'By gastric tube by mistake thirty minutes ago. Patient having severe gastric pain and vomiting dark red material, Vital signs stable. Orange juice and milk forced P.O. Morphine, grains 16 S.C. Will watch. Mihalovits.'
 
 
 66
 'Q. Now, this signature appearing under that note of March 27, 1964, is signed by Mihalovits?
 
 
 67
 'A. I assume it is his writing.
 
 
 68
 'Q. Do you know Dr. Mihalovits?
 
 
 69
 'A. Yes, sir.
 
 
 70
 'Q. Did you know him at that time to be an intern working for the hospital?
 
 
 71
 'A. I believe he was an intern.
 
 
 72
 'Q. An employee of the hospital?
 
 
 73
 'A. Yes, sir.'
 
 
 74
 There was testimony which established that saline solution (sodium chloride) is frequently used internally in treatment of patients. On the other hand, sodium hydroxide is active poison which is frequently fatal if taken internally.
 
 
 75
 Plaintiff's testimony as to his condition immediately after the administration of the sodium hydroxide follows:
 
 
 76
 'Q. Is that the first time you knew that you had been administered sodium hydroxide?
 
 
 77
 'A. Yes, sir, that was the first time.
 
 
 78
 'Q. Now, Mr. Gault, describe your condition during the next several days as you began to recall the events.
 
 
 79
 'A. Well, the next several days my throat was swelled, and my mouth was burned and blistered, and I couldn't eat, and I remember this-- I just wanted to have cold drinks of water, and I would try to drink water and couldn't. Water would also burn my mouth, make my mouth burn worse than it did, and I remember-- I don't know what day it was-- I wanted something cold in my mouth so bad that I asked Dr. Head would he get me a popsicle. It was one night. It was in the nighttime, on up in the night, because I remember he had a hard time finding any, and he did, and I would put that in my mouth and let it slowly melt to cool my mouth off.
 
 
 80
 'Q. Was this the first kind of nourishment you were able to take after the incident occurred?
 
 
 81
 'A. Yes, sir.
 
 
 82
 'Q. Now, Mr. Gault, did you have any diffeculty with your throat swelling to the point where it was closed?
 
 
 83
 'A. Yes, sir, I did.
 
 
 84
 'Q. What sort of situation did this present you with in terms of both swallowing and being able to belch or vomit?
 
 
 85
 'A. I couldn't eat, and I had gas on my stomach, and it would just roll like I was fixing to belch, just roll and try to come out, but it couldn't.
 
 
 86
 'Q. Now, what was the first kind of treatment you were administered for this particular condition, the condition involving your esophagus?
 
 
 87
 'A. I don't remember exactly the first day. I think it was on Monday, if I am not mistaken, and Dr. Van Fossen had a little cable-- I believe it was was just about like a cable, like a speedometer cable with a bulb along toward the end of it, and she would run that down into my stomach to open my throat up, and later on she would run the cable, I call it a cable, down and hook it up to the blood pressure machine and blow it up in the tight spots in my esophagus.
 
 
 88
 'Q. Was this a painful, unpleasant experience?
 
 
 89
 'A. Yes, sir, it was, especially when she would blow the bulb up, inflate the bulb in my throat.
 
 
 90
 'Q. Was this a bloody procedure?
 
 
 91
 'A. Yes, sir. Well, it bled at that time, but not as much so as one time when she couldn't get the cable with the bulb on down in my throat at all, and she had to take steel rod-- I don't know exactly how big around-- it was small, and force it down into my stomach, and she held me back on the bed and prized around trying to open it up, and I bled then. Blood just poured out then.
 
 
 92
 'Q. Was it painful?
 
 
 93
 'A. Yes, sir, it was.
 
 
 94
 'Q. Were you being given narcotics during this period?
 
 
 95
 'A. Yes, sir. Every time that she did a dilation, she would give me a shot in my vein.'
 
 
 96
 We believe, as did the District Judge, that there was ample evidence from which the jury could have concluded that plaintiff suffered injuries which were proximately caused by negligence of defendant or its personnel on March 27, 1964.
 
 THE AMOUNT OF THE VERDICT
 
 97
 Appellant contends that there is no proof of permanent injury to plaintiff and that the jury award is so excessive in relation to plaintiff's injuries as to shock the conscience of the court and require retrial or at least a remittitur.
 
 
 98
 As to both issues, we note the testimony of Dr. Gotten:
 
 
 99
 'Q. Would you be able to state in any reasonable medical certainty your opinion as to the degree or the extent that Mr. Gault has been permanently injured referable to his body as a whole?
 
 
 100
 'A. To me, that's the crux of the whole business, and the reason that I feel like I am up here today, to attempt to help evaluate the degree of permanent disability. Now, to me, in deciding how much permanent disability a person has suffered, you have to take into account the total individual, It would be pretty simple if a person cut off a finger and you could see that's the end of it, and you could evaluate what the loss of the finger amounted to in his occupation and so forth. You can also feel like if a man is a mathematician and loses a leg, why that would be one degree of the total-permanent disability; whereas if he were a mathematician and got hit on the head and lost part of his brain power, that would be something else. So that in a case like this, you have to evaluate the person, his age and his capacity to work in the type of work that he does, the emotional reactions that he has, both as to his past and to his future, and then the degree of permanent unjury that he had. In this case the scarring of the esophagus, which is still requiring dilatation, the abnormality of the stomach, of which we do not know how much of the secreting glands have been destroyed, the fact that he has a pyloroplasty, which is a corrective operation for what he had, but doesn't represent a normal gastro-intestinal functioning organ. So, in taking this all into consideration, I think that a person should arrive at some reasonable conclusion.
 
 
 101
 'Q. Now, Doctor, would you state to what extent you think Mr. Gault has been permanently injured as a result of this burn on March 27, 1964, referable to his body as a whole?
 
 
 102
 'A. My estimate of it would be about thirty to thirty-five percent.
 
 
 103
 'Q. And this is a permanent condition in your opinion?
 
 
 104
 'A. Yes. You see, in a case like this you don't know what the future holds for him and here a year after the accident he is still having dilatation and medical attention. His work record since the accident is poorer than it was before. You don't know whether he is going to have trouble with his esophagus or with his stomach or with the pylorus in the future.
 
 
 105
 'Q. Now, Doctor, of course he could surprise everybody and get a little better?
 
 
 106
 'A. That's right.
 
 
 107
 'Q. By the same token, state whether or not in your opinion he could get much worse?
 
 
 108
 'A. He could.'
 
 
 109
 We also note the recital of facts (for which we find ample support in this record) from the opinion of Judge Brown denying the motion for new trial.
 
 
 110
 'Now, the only real question, we thought, in reading the parties' memoranda and thinking about this case generally, is whether or not the amount of the verdict can be justified, applying the law as the law exists in this Circuit. I might say when we address ourselves to this question we look simply at the amount of the verdict and look at the proof of damage and see if a jury could within reason award that much damage. Now, in this case there was substantial evidence that the stomach and esophagus of this plaintiff was normal or at least not seriously deficient prior to the incident. It is true he had had over a period of time some difficulties, but certainly there was no indication that he had had anything nearly as serious as he had after this particular accident. The radiologist, who I believe is employed by the hospital, or in any event does most of his work at the hospital, testified very definitely that the very thorough radiological examination given to the plaintiff just a few days before this accident indicated that the plaintiff's esophagus was normal and his stomach was normal. So we think that the jury would be well justified in determining that any injury this plaintiff had after this particular incident was caused by the administration of sodium hydroxide.
 
 
 111
 'Now, the proof is that the plaintiff received a very serious injury to his esophagus and his stomach. He had medical and hospital bills of eight thousand dollars, plus loss of income up to the time of trial over a period of a year of four thousand dollars plus. We had testimony from a very well qualified internist, Dr. Gotten, who had reviewed his prior medical record, including the statement in the medical record made by the radiologist, who had examined the plaintiff several times and concluded that as a result of this injury this plaintiff was thirty-three and one-third per cent disabled permanently as to the body as a whole. I believe the proof shows that the plaintiff was twenty-eight years old or maybe twenty-nine. The proof shows that he has gone through a very horrible experience in terms of pain and suffering. The Court can't envision anything worse than to have your esophagus so constricted that to get any relief you have to periodically and frequently go to a doctor and have him stick an instrument down your throat and dilate your esophagus. It sounds like a pretty horrible experience to the Court, and the plaintiff so indicated. He lost, admittedly, twenty per cent of his stomach. The proof is that not only did he lose that much of his stomach, but as we understand it, the valve that connects the stomach with the upper intestine has been changed as a result of that operation which Dr. Gotten thought contributed to his permanent injuries. The doctor who actually performed the surgery on this plaintiff testified that he cut out the part of the stomach that was obviously severely affected with these strictures, but he couldn't honestly say there were not substantial strictures in the remainder of his stomach that might give him trouble in the future, because these strictures are not on the wall of the stomach-- they are contained under the membrane apparently. We even have proof here that this plaintiff became addicted with drugs because of the amount he had to take to relieve him of pain, and Dr. Gotten gave the opinion that if he has any trouble in the future requiring further surgery, he wouldn't be allowed to have as many drugs as in the past because of the possibility of further addiction. It appears that once you become addicted you are much more likely to become addicted in the future.
 
 
 112
 'So, considering all these factors, this Court can't say that the jury reached an improper result. We can't say in dollars and cents, considering how much pain and suffering this man has gone through, which has certainly been a large amount, precisely how much the jury should put on that. Certainly we can't say that what they seemed to put on it was unreasonable, and then you have a thirty-three and one-third per cent permanent disability to the body as a whole of a twenty-eight or twenty-nine year old man who has a life expectancy, I believe, of something like forty years, maybe more, and then you have the special damages incurred prior to the trial. We think that we had a good jury in this case. They are certainly substantial citizens. The foreman of the jury is an executive out here at Sears-Roebuck, and we had a lot of other good people on that jury, and we think that there is no valid basis to set aside this verdict. So, for that reason, the motion for new trial and the motion for judgment notwithstanding the verdict will be overruled, and if you gentlemen will prepare an order we will enter it.'
 
 
 113
 The sequence of events and their timing also lends great weight to plaintiff's medical evidence which attributed to the sodium hydroxide the subsequent surgical removal of a portion of plaintiff's stomach, a pyloroplasty, a gastrostomy, the loss of weight from around 130 pounds to 88 pounds immediately after surgery, the subsequent narcotics addiction and withdrawal therefrom, and the continuing constrictions of the plaintiff's esophagus necessitating repeated periodic mechanical dilation of same. We believe all of these problems and procedures, plus the pain and suffering caused by each, were proper elements for the jury's consideration in determining the amount of the verdict. So too was plaintiff's age of 29 years at the time of the episode, his occupation as an IBM computer operator, with a salary of $136.80 per week, and his hospital, medical and wage losses in excess of $12,000.
 
 
 114
 We also believe the jury could properly take into account the changes testified to concerning plaintiff's personality, enjoyment of food, participation in sports and recreation, and family life. On this latter score, his wife testified:
 
 
 115
 'Q. Had you been able to enjoy the relationship of man and wife while he was in the hospital?
 
 
 116
 'A. No, sir.
 
 
 117
 'Q. After he got out of the hospital, did Dr. Rossett or anyone suggest that he try to take off and be gone and spend time down home and take a little vacation?
 
 
 118
 'A. At one time he told him he thought it would do him good to go down and spend a week with his mother.
 
 
 119
 'Q. And did he do that?
 
 
 120
 'A. Yes, sir.
 
 
 121
 'Q. And did you and he take a trip to the mountains along with your mother?
 
 
 122
 'A. We did.
 
 
 123
 'Q. And you were gone some two or three days?
 
 
 124
 'A. Three days, I think.
 
 
 125
 'Q. How did Mr. Gault make out on that trip? Did it come up to your expectations?
 
 
 126
 'A. No, sir. His throat started closing up, his esophagus, and we had to come back for them to dilate it.
 
 
 127
 'Q. Was he able to get out and pitch camp and chop wood and build fires and that sort of thing?
 
 
 128
 'A. No.
 
 
 129
 'Q. Who had to do that sort of thing?
 
 
 130
 'A. My mother and I.
 
 
 131
 'Q. Are you all pretty good campers too?
 
 
 132
 'A. Well, we love to camp, but we are not too good at it.
 
 
 133
 'Q. How is your husband, Larry, now?
 
 
 134
 'A. He has a constant stomachache all the time, and he still has to go for dilations, and he doesn't have any fun any more. We don't ever go out any more.
 
 
 135
 'Q. Do you ever go out to eat?
 
 
 136
 'A. No sir.
 
 
 137
 'Q. Do you ever go camping any more, after that one time you tried it?
 
 
 138
 'A. No, sir.
 
 
 139
 'Q. How does he get along with children?
 
 
 140
 'A. Well, he tries. He wants to pay attention to them, but he just doesn't feel like it, and, naturally, the children have noticed it.
 
 
 141
 'Q. What about his working? Does he look forward to going to work?
 
 
 142
 'A. No. Everything is a chore to him now.
 
 
 143
 'Q. What has been his ability to go to work regularly?
 
 
 144
 'A. He hasn't been able to go regularly.
 
 
 145
 'Q. About how many days would he work before he would have to lay off to recuperate?
 
 
 146
 'A. Well, he works day or two, and then he lays off some, and then he goes back to work a day or two.
 
 
 147
 'Q. Has this affected your family finances, Mrs. Gault?
 
 
 148
 'A. Yes, sir, quite a bit.
 
 
 149
 'Q. Has your financial condition deteriorated as far as your bills and obligations are concerned?
 
 
 150
 'A. I did not understand.
 
 
 151
 'Q. Have your finances gotten in pretty bad shape?
 
 
 152
 'A. Yes, sir, they have.
 
 
 153
 'Q. Mrs. Gault, what are the main differences in Mr. Gault now, compared to what sort of man he used to be prior to March of 1964?
 
 
 154
 'A. Well, to me he is altogether different. He doesn't enjoy life any more. He used to like to work. He don't now.'
 
 
 155
 Appellant relies strongly on a Tennessee rule pertaining to the proof of permanent injury. In Maryland Casualty Co. v. Young, 211 Tenn. 1, 362 S.W.2d 241 (1962), the Supreme Court of Tennessee said:
 
 
 156
 "To warrant a recovery for a permanent injury, the future effect of the injury must be shown with reasonable certainty. It is not necessary that the evidence show conclusively or without a shadow of doubt that the injuries are permanent. But while absolute certainty should not be required, a mere conjecture, or even a probability, does not warrant the giving of damages for future disability which may never exist.' 15 Am.Jur. 486, 75.' Maryland Casualty Co. v. Young, supra at 243.
 
 
 157
 Our review of this record convinces us that the damages for which plaintiff sought recovery, including the permanent injuries testified to, were established 'with reasonable certainty.' The amount of the verdict is certainly large-- but against the impact of the events we have outlined upon the life, the well-being and the future of this plaintiff, we cannot say that it is so shocking to the conscience or so grossly excessive as to have required the District Judge to grant the motion for retrial or remittitur. See Werthan Bag Corp. v. Agnew, 202 F.2d 119 (C.A.6, 1953); Lebech v. William A. Jarvis, Inc., 250 F.2d 285 (C.A.3, 1957); Kroger Company v. Rawlings, 251 F.2d 943 (C.A.6, 1958); Collins v. Clayton & Lambert Mfg. Co., 299 F.2d 362 (C.A.6, 1962); Jenkins v. Associated Transport, Inc., 330 F.2d 706 (C.A.6, 1964).
 
 THE JURY'S DELIBERATIONS
 
 158
 Following the rendering of the verdict in this case, counsel for the defendant undertook extensive interviewing of the jurors who had sat at the trial. Subsequently, affidavits were filed by defendant's attorney quoting what purported to be his version of what the jurors told him about the issues which were discussed in the course of their deliberations which bore on the size of verdict.
 
 
 159
 It is appellant's contention that these affidavits demonstrate that the verdict was based upon extraneous factors, misconduct, and passion and prejudice on the part of the jurors. The issues which were claimed to have been discussed, and which appellants believe to be so prejudicial in nature as to require our reversal for new trial include the following: The amount, if any, that plaintiff would have to pay in income tax in the event of recovery; the amount of the recovery which would go to plaintiff's attorney; the annual income of the Pathology Department of defendant hospital; the question as to whether or not punitive damages should be awarded to make sure that this hospital and other hospitals were more careful in the future, and finally, the question as to whether or not keeping a pregnant woman on a job beyond the sixth or seventh month of pregnancy was a sound business practice.
 
 
 160
 Plaintiff in turn filed affidavits signed by individual jurors themselves. These affidavits tended to admit that all of these topics were discussed at one time or another; but they also tended to assert (in each instance except one) that the topic discussed was compared to the charge given by the United States District Judge, and that in each such instance the jury followed the judge's charge. For example, the jury propounded to the judge by written inquiry the question of income tax, both as related to the amount plaintiff would have to pay and the amount plaintiff's attorney would have to pay, and the judge properly charged them that the plaintiff would not be required to pay any income tax, and that the second question was immaterial to the issues before them.
 
 
 161
 The judge did not include punitive damages in his outline of recoverable damages, and limited the damages the jury could consider to 'those injuries which you find were directly and proximately caused by the accident on which he sues.' Jurors' affidavits stated that although there was some discussion of punitive damages, they agreed that they were required to follow the charge, that they noted that the charge did not allow for punitive damages, and that they followed it.
 
 
 162
 The exception to what has been already stated pertains to the allegation that the foreman of the jury reported to the jury that in his bank they had a rule against allowing female employees to continue to work after the seventh month of pregnancy.
 
 
 163
 The District Judge conducted a hearing on these issues in consideration of the motion for new trial, and dealt with them thus in his opinion rejecting that motion:
 
 
 164
 'But where the only grounds for impeachment is that the jury simply did not take into consideration only the damage factors that were included in the Court's charge, that is to say, they went outside those damage factors, the Court doesn't believe that the jury verdict can be impeached on that basis. However, even if we consider the affidavits of the defendant, along with the affidavits of the plaintiff, and we read them all, we would say that the preponderance of the evidence as shown by those affidavits is that the verdict actually arrived at in this case was arrived at in accordance with the instructions of the court, that is to say, even assuming that some of these improper things were mentioned in the jury room, which we have already held are not a basis for impeaching a verdict, but assuming they were mentioned, we felt, after reading these affidavits, that when they got down to the actual amount of the verdict they arrived at it in a proper manner. The Charge of the Court was back in the jury room with them, and they frequently referred to it, and when these matters wre brought up, they went back in the Charge, according to several of the affidavits, and determined that they could not consider those matters. So, whereas it appears that at the beginning of the deliberations several of them, perhaps the majority, wanted to give two hundred and fifty thousand dollars, they finally worked it down, as jurors frequently do, to a consensus of a hundred and sixty-two thousand five hundred.
 
 
 165
 'So, for two separate reasons we don't believe that the jury verdict should be overturned on the ground of improper consideration of extraneous matters-- the first being we don't believe that the affidavits should be considered, because we don't believe that's a ground. But in addition to that, even if you considered them, we don't think that the defendant has properly proven such grounds.'
 
 
 166
 On an appeal from a final judgment, the grant or denial of a motion for new trial cannot be reversed unless we find an abuse of the District Court's discretion. Southern Railway Company v. Miller, 285 F.2d 202, 206 (C.A.6, 1960); Werthan Bag Corp. v. Agnew, supra, 202 F.2d at 121-122; Burns v. Travelers Insurance Co., 344 F.2d 70, 74 (C.A.5, 1965); 6 Moore Federal Practice 59.05(5) at 3759 and 59.15(1) at 3893 (2d ed. supp. 1965).
 
 
 167
 We find no such abuse here. Appellant in arguing this issue on appeal has relied primarily upon Tennessee cases. The right of jury trial in the federal courts is a federal constitutional right. U.S.Const. Amend. VII. We believe that the question as to whether or not extraneous influences have so prejudiced jury consideration of the issues in the jury trial as to warrant reversal for new trial is an issue to be decided by the standards of federal law. Still v. Townsend, 311 F.2d 23, 24 (C.A.6, 1962); 6 Moore Federal Practice 59.04(1) at 3710-11 (2d ed. supp. 1965).
 
 
 168
 In the leading federal case, McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), the Supreme Court gave the rationale for the basic federal rule in relation to such efforts to impeach jury verdicts:
 
 
 169
 'The rule on the subject has varied. Prior to 1785 a juror's testimony in such cases was sometimes received, though always with great caution. In that year Lord Mansfield, in Vaise v. Delaval, 1 T.R. 11, refused to receive the affidavit of jurors to prove that their verdict had been made by lot. That ruling soon came to be almost universally followed in England and in this country. Subsequently, by statute in some states, and by decisions in a few others, the juror's affidavit as to an overt act of misconduct, which was capable of being controverted by other jurors, was made admissible. And, of course, the argument in favor of receiving such evidence is not only very strong, but unanswerable-- when looked at solely from the standpoint of the private party who has been wronged by such misconduct. The argument, however, has not been sufficiently convincing to induce legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule 'would open the door to the most permicious arts and tampering with jurors.' 'The practice would be replete with dangerous consequences.' 'It would lead to the grossest fraud and abuse' and 'no verdict would be safe.' Cluggage v. Swan, 4 Binn. 155; Straker v. Graham, 4 M. & W. 721.
 
 
 170
 'There are only three instances in which the subject has been before this court. In United States v. Reid, 12 How. 361, 366 (13 L.Ed. 1023), the question, though raised, was not decided because not necessary for the determination of the case. In Clyde Mattox v. United States, 146 U.S. 140, 148 (13 S.Ct. 50, 36 L.Ed. 917), such evidence was received to show that newspaper comments on a pending capital case had been read by the jurors. Both of those decisions recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.' This might occur in the gravest and most important cases; and without attempting to define the exceptions, or to determine how far such evidence might be received by the judge on his own motion, it is safe to say that there is nothing in the nature of the present case warranting a departure from what is unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict. The principle was recognized and applied in Hyde v. United States, 225 U.S. 347 (32 S.Ct. 793, 56 L.Ed. 1114), which, notwithstanding an alleged difference in the facts, is applicable here.' McDonald v. Pless, supra at 268-269, 35 S.Ct. at 784.
 
 
 171
 The Eighth Circuit in Butler v. United States, 317 F.2d 249, 6 A.L.R.2d 582 (C.A.8, 1963), cert. denied, 375 U.S. 838, 84 S.Ct. 77, 11 L.Ed.2d 65 (1963), outlined with some care the conflicting principles in the federal jurisdiction bearing on this issue:
 
 
 172
 'The general rule is that jurors may not impeach their verdict, Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (rev'd on other grounds, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)); McDonald v. Pless, 238 U.S., 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); Lohr v. Tittle, 10 Cir., 275 F.2d 662, 667 (1960); Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, 847 (1934), cert. denied, 293 U.S. 623, 55 S.Ct. 237, 79 L.Ed. 710 (1934), but the rule is not so inflexible as to invariably preclude inquiry into what transpired during the jury's deliberation, or to prevent reversal due to the exertion of extraneous, prejudicial influences upon the jury. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). See also United States v. Grieco, 2 Cir., 261 F.2d 414 (1958), cert. denied, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); Jorgensen v. York Ice & Machinery Corporation, 2 Cir., 160 F.2d 432 (1947), cert. denied, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). However, the cases indicate that a juror's testimony revealing the reasons that in fact induced him or other members of the jury to arrive at their verdict cannot be admitted as impeachment testimony. United States v. Crosby, 2 Cir., 294 F.2d 928, 949-950 (1961), cert. denied, Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); Rotondo v. Isthmian Steamship Co., 2 Cir., 243 F.2d 581 (1957), cert. denied, 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45 (1957).' Butler v. United States, supra at 262.
 
 
 173
 It appears to us that what we have here is a clear attempt to invade the mental processes by which the jury arrived at its verdict. The hazards to the jury system of sanctioning such invasions are very great. Such attempts at impeachment of jury verdicts are generally rejected. Western Spring Service Co. v. Andrew, 229 F.2d 413 (C.A.10, 1956); Orenberg V. Thecker, 79 U.S.App.D.C. 149, 143 F.2d 375 (1944); Southern Pacific Co. v. Haight, 126 F.2d 900 (C.A.9, 1942), cert. denied, 317 U.S. 676, 63 S.Ct. 154, 87 L.Ed. 542 (1942); Maher v. Isthmian Steamship Co., 253 F.2d 414 (C.A.2, 1958); Northern Pacific Ry. Co. v. Mely, 219 F.2d 199 (C.A.9, 1954).
 
 
 174
 We do not deal in this case with extraneous influences brought into the jury room from outside (see Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Stiles v. Lawrie, 211 F.2d 188 (C.A.6, 1954)) or any improper approach to or communication with the jury prior to or during the course of its deliberations by some outsider. Texas & New Orleans R.R. Co. v. Underhill, 234 F.2d 620, 64 A.L.R.2d 152 (C.A.5, 1956); Paramount Film Distributing Corp. v. Applebaum, 217 F.2d 101 (C.A.5, 1954), cert. denied, 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955); Southern Pacific Co. v. Klinge, 65 F.2d 85 (C.A.10, 1933), cert. denied, 290 U.S. 657, 54 S.Ct. 72, 78 L.Ed. 569 (1933); Wheaton v. United States, 133 F.2d 522 (C.A.8, 1943).
 
 
 175
 In the one instance where information from outside of the trial record was reported (namely, the bank policy pertaining to pregnant women), we believe that this is very close to representing the sort of information about commonly known facts of life which jurors are supposed to possess and to bring to their consideration of the case. Pacific Employer Ins. Co. v. Orren, 160 F.2d 1011 (C.A.5, 1947). In any event, we do not believe that this item of jury discussion prejudiced the results or constituted reversible error.
 
 
 176
 The District Judge was well within his discretion in overruling the motion for a new trial and entering judgment on the verdict.
 
 
 177
 Because we affirm the District Judge's denial of the motion for new trial, we need not rule upon the propriety of a defeated litigant's entry into an inquisition of a jury's deliberations, as was done here. We announce no general rule on the matter, but express our view that generally jurors should not be exposed to such intrusion.
 
 
 178
 Affirmed.