**Anomi R. URSETH, Plaintiff,**

v.

**CITY OF DAYTON, et al., Defendants.**

**No. C-3-84-103.**

United States District Court,
S.D. Ohio, W.D.

July 9, 1987.

Irving I. Saul, Dayton, Ohio, E. John Wist, A. Melvin Kemmer, Tipp City, Ohio, for plaintiff.

Neil F. Freund, Jane M. Lynch, Dayton, Ohio, for defendants.

OPINION AND ENTRY SETTING FORTH COURT'S INTENTION TO OVERRULE DEFENDANT'S SUPPLEMENTAL MOTION FOR NEW TRIAL ON THE BASIS OF JUROR MISCONDUCT (DOC. # 209); PLAINTIFF GIVEN LEAVE TO FILE MEMORANDUM CONTRA DEFENDANT'S MOTION FOR NEW TRIAL OR IN THE ALTERNATIVE FOR REMITTITUR (DOC. # 208) WITHIN STATED PERIOD OF TIME; THIS OPINION AND ENTRY IS NOT A FINAL, APPEALABLE ORDER

RICE, District Judge.

This case is before the Court on Defendant City of Dayton's Supplemental Motion for New Trial (Doc. # 209), which seeks a new trial in this case on the basis of juror misconduct. For the reasons set forth below, the Court, in the filing of a comprehensive entry setting forth its rulings on *all* post-trial motions, will overrule said motion.[1]

Trial of this case began with the empaneling of a jury on June 11, 1986. More than seven weeks later, on August 4, 1986, that jury returned answers to twenty-four interrogatories submitted by the Court.[2] Based on those answers, the Court entered a judgment in favor of Defendant on Plaintiff's claim under 42 U.S.C. § 1983 (the civil rights claim), and against Defendant and in favor of Plaintiff in the amount of $3,500,-000 on Plaintiff's pendent state law wrongful death claim. Following entry of judgment, the parties filed a number of motions in addition to the one presently before the Court, to wit:

1. Plaintiff's Motion for New Trial (Doc. # 211), upon the ground of the alleged inconsistency of the answers to Interrogatories # 10 and # 11, which the Court has indicated it will overrule;

2. Defendant's Motion to Alter or Amend Judgment (Doc. # 202), by setting off from the judgment the amount of the Plaintiff's pretrial settlements with other Defendants and any monies obtained from collateral sources, which the Court has indicated that it will grant in part and overrule in part, with the result being that $1,116,666.66 from Plaintiff's pretrial settlements with other parties would be ordered set off from the $3,500,000 judgment;

3. Defendant's Motion for Relief from Judgment (Doc. # 230), upon the ground of Ronald Price's indictment subsequent

---

1. As this Court has previously indicated, *see* Entry of March 6, 1987 (Doc. # 239), in order to avoid piecemeal appeal of this case, the Court will not render final appealable rulings on any of the post-trial motions pending before it until each and every motion has been addressed. Once the Court has considered each and every post-trial motion, an entry will be filed setting forth in short form the Court's final appealable decisions with respect thereto. Accordingly, this entry is not intended to constitute a final, appealable order.

2. Twenty-five interrogatories were submitted by the Court to the jury with instructions for their sequential completion. Based upon the answer given by the jury to Interrogatory # 24, those instructions directed it *not* to return an answer to Interrogatory # 25.

to trial, which the Court has indicated it will overrule; and

4. Defendant's Motion for New Trial or in the Alternative Remittitur (Doc. # 208), which the Court has not yet ruled upon.

Upon review of Defendant's Supplemental Motion for New Trial (Doc. # 209), the memoranda in support and in opposition thereto, and particularly the portions of the affidavits of three jurors and one alternate juror attached to Defendant's motion which this Court has found to be competent, admissible evidence under Federal Rule of Evidence 606(b), the Court determined that there existed three allegations or areas of juror misconduct such as could possibly require that the jury verdict be vacated, to wit:

1. disclosure to the jury by Juror Gilligan of newspaper accounts of settlement offers made to Plaintiff by Defendant City of Dayton;

2. prejudgment of the case by Juror Gilligan; and

3. perjury on voir dire by Juror Gunner.

*See* Decision and Entry of February 13, 1987 (Doc. # 235). The Court determined that a hearing was required in order to explore further these areas of possible juror misconduct. *See Standard Alliance Industries v. Black Clawson Co.*, 587 F.2d 813, 828 (6th Cir.1978) ("The correct response of a trial judge, when confronted with allegations of improper jury contact, is to give notice to the parties and to question the jurors on the record about any alleged incident."). The Court accordingly held *in camera* hearings on February 28, 1987, March 27, 1987 and April 21, 1987, at which each of the six regular jurors and the two alternate jurors were questioned under oath by the Court and counsel for each party. The testimony at those hearings brought forth two additional areas of possible misconduct affecting the jury:

1. statements by Deputy Clerk of Courts Brice Mantel overheard by

several jurors indicating that trial had been delayed because the parties were discussing a settlement (*see* Transcript of *In Camera* Proceedings (Doc. ## 242, 243 & 246) at 69–70 & 213); and

2. statements by Juror Gilligan that the Plaintiff expected to be awarded millions in the lawsuit (*see id.* at 72).

Moreover, during discussion with counsel at those hearings, the Court found that Mr. Gunner's statements as to his previous experiences with police officers (the failure to reveal such on voir dire allegedly constituting perjury) should also be examined to determine whether they constituted an extraneous prejudicial influence upon the jury.

Thus, based upon the *competent, admissible* portions of affidavits presented and the *competent, admissible* testimony at the *in camera* hearings, the Court has been presented with a total of five areas of misconduct that must be examined to determine whether any one or more or all of them warrant the granting of a new trial. In making this determination, the Court will first examine the alleged perjury on voir dire of Juror Gunner. The Court will then examine each of the areas of possible misconduct to determine whether the introduction of extraneous information to the jury had sufficient potential prejudicial effect such as to require the granting of a new trial.[3] As a prerequisite to these analyses, however, the Court must first set forth specifically that evidence which it has found may under the law be considered in determining whether a new trial should be granted.

## A. EVIDENCE CONSIDERED BY THE COURT: FEDERAL RULE OF EVIDENCE 606(b)

Initially in determining what evidence it is permitted to consider with respect to the impeachment of a jury verdict, the Court notes that federal rather than state law

---

**3.** As indicated above, the statements allegedly made by Juror Gunner in the jury room regarding his past experiences with the police will also be analyzed under the extraneous prejudicial information standard, in order to give complete consideration to any possible improprieties in the verdict.

governs. *See e.g., Wiedemann v. Galiano,* 722 F.2d 335, 337 (7th Cir.1983); *Gault v. Poor Sisters of St. Frances Seraph of the Perpetual Adoration, Inc.,* 375 F.2d 539, 549 (6th Cir.1967).[4] Thus, the admissibility of the evidence presented in support of Defendant's Motion for a New Trial (i.e. the competence of the jurors' testimony through affidavits and at the hearings) is governed by Federal Rule of Evidence 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statements occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

■ Thus, while jurors are generally incompetent to testify as to any matter or statement occurring during their deliberations or the effect of anything on their mental processes, the rule provides an exception which permits jurors to testify as to external influences upon them. *See Tanner v. United States,* — U.S. —, ——-—, 107 S.Ct. 2739, 2745–51, 97 L.Ed.2d 90 (1987); *In re Beverly Hills Fire Litigation,* 695 F.2d 207, 213 (6th Cir.1982); *Womble v. J.C. Penney,* 431 F.2d 985, 989 (6th Cir.1970). This exception permitting

inquiry into external influences upon the jury, however, is limited to identification of those extraneous sources of information—once the existence of external influences upon the jury has been established, neither the Court nor counsel may inquire into the subjective effect of these external influences upon particular jurors. Rather, the Court must determine whether such extraneous information was prejudicial by determining how it would effect an objective "typical juror." *See Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984); *United States v. Bassler,* 651 F.2d 600, 603 (8th Cir.); *cert. denied,* 454 U.S. 944, 102 S.Ct. 485, 70 L.Ed.2d 254 (1981) *and* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 305 (1982); *Miller v. United States,* 403 F.2d 77, 83 n. 11 (2d Cir.1968); 3 Weinstein & Berger, *Weinstein's Evidence* ¶ 606[5] (1985 & May, 1987 cum.supp.).

■ The scope of Rule 606(b), however, does not extend to allegations of juror perjury on voir dire. Thus, statements made by a juror during deliberations (or prior thereto), which would tend to indicate that he or she had perjured himself or herself on voir dire, are not excluded by the rule, and so are competent, admissible evidence under the general provisions of Rule 601. *See, e.g., Clark v. United States,* 289 U.S. 1, 17–18, 53 S.Ct. 465, 470–71, 77 L.Ed. 993 (1932) (Cardozo, J.); *United States v. Robbins,* 500 F.2d 650 (5th Cir.1974).

■ Applying these rules of admissibility to the evidence presented by affidavit and at the hearings held to investigate alleged juror misconduct, the Court has limited the testimony considered to that which showed *either* the receipt of extraneous information by jurors prior to or during deliberations *or* statements allegedly made prior to or during deliberations which

---

4. The Court notes that if Ohio law were to govern the scope of the evidence the Court may consider in determining whether the verdict herein may be impeached, *none* of the evidence presented whether by affidavit or by testimony at the *in camera* hearing would be considered. Ohio Rule of Evidence 606(B) specifically provides: "A juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention or

whether any outside influence was improperly brought to bear on any juror, *only after some outside evidence of that act or event has been presented.*" (emphasis added). Since the only evidence presented either by affidavit or at the hearings in this case has come directly from the jurors themselves, under Ohio law there would be no competent evidence upon which the Court could consider with regard to Defendant's request for a new trial.

indicated perjury during voir dire. The Court specifically excluded from presentation at the hearing, and declined to consider in the affidavits presented by Defendant, both testimony as to the subjective effect of any extraneous information introduced upon the individual juror's deliberative process and testimony as to statements made in the heat of juror debate which neither indicated the introduction of extraneous information to the jury nor tended to demonstrate juror perjury in voir dire. The Court therefore finds that all of the testimony heard and not stricken at the *in camera* hearings constitutes competent, admissible evidence.[5] The portions of the juror affidavits found to be competent and admissible are set forth *infra* in the Appendix attached hereto. It is upon this evidence found admissible from the affidavits and the hearing, and that evidence only,[6] that the Court has based its determinations of whether a new trial should be granted either because of alleged juror perjury on voir dire or the introduction of extraneous prejudicial materials to the jury prior to or during its deliberations.

## B. JUROR PERJURY ON VOIR DIRE

Prior to discussing its factual findings with respect to Gunner's alleged perjury on voir dire, the Court must set forth the legal framework upon which allegations of juror perjury in voir dire are to be examined. In *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850,

78 L.Ed.2d 663 (1984), the Supreme Court set forth this framework:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror has failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

In light of this specific test set by the Supreme Court for the granting of a new trial upon a finding of juror perjury on voir dire, the Court must find, contrary to Defendant's arguments, that only a portion of the Sixth Circuit's standard for the granting of such a new trial set forth in *McCoy v. Goldston*, 652 F.2d 654 (1981), remains controlling. Specifically, the Court finds that the first basis set forth as grounds for a new trial on a finding of juror perjury on voir dire remains viable:

> [W]e hold that a new trial must be granted where the undisclosed information would have resulted in the juror's disqualification for cause. This occurs when either the juror admits a feeling of partiality or "the judge makes a pragmatic judgment that there is a substantial possibility of the juror unconsciously favoring one side or another."

**5.** The Court notes that at pages 52 (lines 8–13), 234 (lines 17–23) and 317 (lines 4–11) of the Transcript of *In Camera* Proceedings objections or motions to strike were made upon which the Court deferred ruling. Those motions are now found well taken under the parameters of Fed. R.Evid. 606(b), and each of those portions of testimony is ordered stricken and has been disregarded by the Court.

**6.** Even if the Court were to assume *arguendo* that it had been too restrictive in its findings as to admissibility, with respect to Juror Lancaster, the Court would find that while the competent, admissible portions of her affidavit and testimony were credible, being both logically consistent within themselves and consistent with the testimony of other jurors, those portions of her affidavit that the Court has found incompetent and therefore inadmissible would not be found credible. Quite simply, as the Court's analysis,

*infra,* regarding the probable effects of the extraneous influences upon the jury reveals, Ms. Lancaster's assertions as to the effect of the extraneous influence of the fact and amount of the Defendant's settlement offer to the Plaintiff upon her are logically inconsistent with the answers to the interrogatories joined in by her. For example, if Ms. Lancaster genuinely believed that the Defendant's settlement offer constituted an admission of responsibility for Mr. Urseth's death, it is impossible that she would have voted on the Plaintiff's civil rights claim to find that the City of Dayton Police Department's supervisory policy was not the moving force behind Mr. Urseth's death. Thus, even were such statements competent, admissible evidence, the Court would find them so lacking in credibility that they would be insufficient to support the granting of a new trial.

*Id.* at 659 (quoting *Daniels v. United States,* 357 F.2d 587, 591 (D.C.Cir.1966) (Bazelon, J. dissenting)). Not remaining viable after *McDonough,* however, is the second ground for a new trial set forth in *McCoy,* to wit: "[A] district judge shall presume bias, and grant a new trial, when a juror deliberately conceals information or gave a purposefully incorrect answer." *Id.* This second basis for a new trial on a showing of juror perjury on voir dire was based upon counsel's inability to use his or her peremptory challenges fully without the benefit of completely truthful answers by all jurors on voir dire, a basis which the Supreme Court specifically rejected as grounds for a new trial in *McDonough. See* 464 U.S. at 555, 104 S.Ct. at 850 ("[I]t ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.").

 In short, the Court, in determining whether a new trial should be granted because of juror perjury on voir dire, must first determine that a juror failed to answer honestly a material question during the voir dire examination. Upon such a finding, the Court must determine whether that failure to give a correct response would have provided a basis for a challenge for cause, either by finding that the juror has admitted a feeling of partiality or by the pragmatic determination that there was "a substantial possibility of the juror unconsciously favoring one side or another."

 Turning first to the question of whether Mr. Gunner failed to answer honestly any material questions, the Court notes that Defendant has identified five questions asked on voir dire which it believes should have elicited information about Mr. Gunner's previous bad experiences with police officers:

1. "Have you or a friend, family member or relative ever made a claim for what can best be described as use of excessive force?" (Transcript of Proceedings (Jury Voir Dire) (Doc. # 222) [hereinafter Transcript of Voir Dire Proceedings] at 42);

2. "Ladies and gentlemen, we have all had experiences with police officers, and my question to you is have you had any experience with police officers, good, or bad, that would make you not a good juror in a case in which police officers are involved?" (Transcript of Voir Dire Proceedings at 59);

3. "Is there anything in your background or anything in the background of any friend, family member or relative that we have not discussed that would cause you difficulty sitting in a case in which improper actions by a police officer are claimed?" (Transcript of Voir Dire Proceedings at 65);

4. "Is there any reason in the minds of any prospective juror at this point why you could not be a fair and an impartial juror in this case?" (Transcript of Voir Dire Proceedings at 73); and

5. "Your immediate family—and by immediate family I mean husband, wife, children, that nature—could I see the hands of those persons, prospective jurors who have had someone in their immediate family arrested for something other than a traffic offense?.... Other than the three individuals who have already responded about arrests for disorderly, has anyone been involved with a police officer or a police department which did not result in an arrest but which left an impression that the police did not act properly in some fashion?" (Transcript of Voir Dire Proceedings at 95–96).[7]

At the hearings conducted to determine whether juror misconduct had occurred, examination of Juror Gunner by the Court and counsel revealed three significant past experiences with police and law enforcement officers. The first of these incidents involved the arrest of Mr. Gunner's son after abandoning his car for some type of

---

**7.** Defendants in their memorandum identified only the second portion of this question as indicating an occasion where Juror Gunner's failure to answer constituted perjury. The Court believes that both portions of the question must be included in order to make that determination.

traffic violation and for carrying a concealed weapon. Mr. Gunner apparently felt that the police should not have added the carrying a concealed weapons charge to the traffic violation charge since the alleged weapon was merely a "shoe horn and brush" which looked like a sword, Transcript of *In Camera* Proceedings at 261, and that they should have permitted him to speak with his son earlier than they did. *Id.* at 271. Mr. Gunner indicated, however, that he knew his son was wrong and harbored no ill will towards those police officers. *Id.* at 259–61 & 299. Indeed, he said he had sent business to the lie detector service that one of those police officers had opened. *Id.* at 299.

The second experience with the police testified to by Mr. Gunner involved the burglary of the Kenwood, Ohio Pogue's Store Jewelry Department by an off duty police officer. Mr. Gunner's employment gave him, for a period of time, general responsibility for the jewelry departments of all Cincinnati area Pogue's Stores. During that time an off duty police officer serving as a security guard at the Kenwood store stole a number of watches from the jewelry department. *Id.* at 273–74. Mr. Gunner personally suffered no loss from this theft, but the department store chain lost the amount of its insurance policy deductible. *Id.* at 293. Mr. Gunner indicated, however, that he had had numerous positive experiences with police officers in his work and that he encouraged them to frequent his jewelry departments. *Id.* at 260. Indeed, Mr. Gunner's third experience with the police involved his traveling to Tennessee to assist the FBI and the Tennessee Bureau of Investigation in the identification of a robbery suspect. Mr. Gunner described this experience as a very positive experience with law enforcement officials, and he received letters of appreciation from both the FBI and the Tennessee Bureau of Investigation. *Id.* at 272–73 & 293.

Reviewing these experiences in light of the Court and counsel's questions on voir dire, the Court must find that while its and counsel's questions were calculated to reveal precisely the information disclosed by Mr. Gunner at the hearing (and not brought forth by him during the voir dire examination), Mr. Gunner could have held an honest belief that his failure to answer those questions was entirely proper. In reaching this conclusion, the Court notes that the language used by lawyers is often not given the same meaning by lay persons. *See McDonough*, 464 U.S. at 555, 104 S.Ct. at 849 ("The varied responses to respondents' question on *voir dire* testify to the fact that jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges."). Specifically, the Court finds that Mr. Gunner was not deliberately untruthful in failing to answer the Court's question with respect to excessive force, because there is no indication anywhere in his or anyone else's testimony that he or any relatives or acquaintances were subjected to excessive force by police officers. Moreover each of the other questions asked by the Court which related to past experiences with the police (those identified as 2, 3 and 4 *supra*) could have been construed by Mr. Gunner as calling for a judgment on his part rather than the Court's as to whether his previous experiences prejudiced him such as to require an answer to each question. In other words, Mr. Gunner could have construed questions containing clauses such as "that would make you not a good juror," "that would cause you difficulty sitting in a case," and "could not be a fair and an impartial juror" as requiring an assessment by himself as to whether his prior experiences with the police were worthy of mention to the Court. Finally, the Court notes that, reading literally Defendant's voir dire question (identified as 5 *supra*), Mr. Gunner was not dishonest in failing to answer it. The first portion of Defendant's question asks whether any relatives of the prospective jurors had been arrested for anything other than a traffic offense—Mr. Gunner's son apparently *was* arrested for a traffic offense. To the extent his son was also charged with carrying a concealed weapon, Mr. Gunner apparent-

ly believed that charge to be totally invalid. A second portion of Defendant's question asks whether the prospective jurors' friends or relatives had had any negative experiences not resulting in arrest which might cause them difficulty in serving as fair and impartial jurors. Mr. Gunner's son was arrested. Thus, without denying that Mr. Gunner's responsiveness on voir dire could have been more forthright and informative (thereby allowing the Court and counsel to judge his ability to serve as a fair juror), the Court must conclude that Mr. Gunner did not, at least in a technical sense, perjure himself on voir dire, in that he did not fail to answer honestly the questions of the Court and counsel as he understood them.

Having concluded that he did not knowingly fail to answer honestly the questions of the Court and counsel, it is not necessary to reach the issue of whether the information provided in the affidavits and the testimony at the hearing (which complete answers to those questions on voir dire would have provided) would have been a proper basis for a challenge for cause of Mr. Gunner. However, because Mr. Gunner's failure to answer these questions *did* deprive the Court and counsel of information material to the jury selection process, the Court will, in order to insure that Defendant is given the benefit of every doubt, consider whether the information Mr. Gunner withheld, had it been revealed on voir dire, would have entitled Defendant to a challenge for cause. Since Mr. Gunner at the hearing on jury misconduct did not indicate or admit a feeling of partiality towards either party (indeed he *denied* any feelings of partiality towards either side (*see* Transcript of *In Camera* Proceedings at 301)), the Court must make a finding, based upon the totality of Mr. Gunner's past experiences with the police and other law enforcement officials, as to whether

there was a substantial possibility that he unconsciously favored one side (the Plaintiff) over the other.[8] As indicated above, the evidence adduced at the hearing investigating juror misconduct indicated that Mr. Gunner had had both positive and negative experiences with the police. Both Mr. Gunner and Catherine White specifically testified that he had discussed both his good and bad experiences with the police in the jury room. *See* Transcript of *In Camera* Proceedings at 80 & 259–64. In those instances when he had experienced police conduct which he found upsetting or unsatisfactory, there was convincing evidence that he did not harbor a grudge or feeling of resentment towards those police officers or police officers in general (e.g., he referred business to the lie detector service of a police officer who had arrested his son). Thus, based upon the totality of these experiences, and the Court's favorable assessment of Mr. Gunner's sincerity and truthfulness in his testimony before it at the *in camera* hearing, the Court must find that there was no substantial possibility that Gunner was either consciously or unconsciously biased against the Defendant.

In sum, the Court finds that Mr. Gunner did not fail to answer honestly any material question asked during voir dire examination, but that he may have understood several of those questions differently than the Court and counsel intended. While this finding might negate the need to engage in further analysis as to whether the full answers to such material questions, if given, would have warranted the granting of a challenge for cause at the close of voir dire, the Court additionally finds that, had all the information sought by those questions been before the Court at that time, it would have been insufficient to warrant the granting of such a challenge for cause. In so concluding, the Court notes that Mr. Gunner specifically denied in testimony any

---

**8.** The Court finds that while the questions asked Mr. Gunner on voir dire, had they been fully answered as the Court and counsel intended, would have brought forth only Mr. Gunner's bad experiences with the police, further questioning would have elicited the additional information, testified to at the *in camera* hearings, concerning Mr. Gunner's good experiences with the police, the end result being that, had a challenge for cause been made, the Court would have overruled same upon the ground that no substantial possibility had been shown that Gunner was either consciously or unconsciously biased against the Defendant.

---

feeling of partiality for either party. Moreover, the evidence adduced at the *in camera* hearings persuasively indicated (by, for example, Mrs. White's statement that Mr. Gunner described both good and bad experiences with the police) that there was no "substantial possibility" of Mr. Gunner having "unconsciously favor[ed] one side or another." Accordingly, the Defendant's Motion for a New Trial, insofar as it rests on Mr. Gunner's alleged perjury in voir dire, will be overruled.

## C. INTRODUCTION OF EXTRANEOUS PREJUDICIAL INFORMATION TO THE JURY

■ Turning to Defendant's arguments that a new trial should be granted because of the introduction of extraneous prejudicial information to the jury, the Court initially notes that the Sixth Circuit has established a test which requires the liberal granting of such motions:

> Our circuit recognizes that such an error [i.e., the introduction of extraneous prejudicial information] can rarely be viewed as harmless. The jury's receipt of such extraneous information "requires that the verdict be set aside unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict."

*In re Beverly Hills Fire Litigation,* 695 F.2d 207, 215 (6th Cir.1982) (quoting *Stiles v. Lawrie,* 211 F.2d 188, 190 (6th Cir.1954)). In *Stiles,* the Sixth Circuit set forth the reasoning underlying this strict rule:

> It is not for the court to say whether there was sufficient evidence adduced at the trial to justify the findings of the jury, and that the evidence improperly received by them could have no influence on the verdict.... When improper evidence, that may have prejudiced the case, has been received by the jury, the law will so presume [the influence upon the verdict].

211 F.2d at 190. Thus, a mere finding by the trial court that the verdict was supported by the evidence adduced at trial is insufficient grounds upon which to deny a motion for a new trial that is based on the introduction of extraneous information to the jury. Rather, "[e]xternal and verifiable indicia of harmlessness are necessary to rebut this presumption [of prejudice]." *Budoff v. Holiday Inns, Inc.,* 732 F.2d 1523, 1527 (6th Cir.1984). Nevertheless, when adequate indicia of the harmlessness of extraneous information are found, the Sixth Circuit has upheld the denial of a motion for a new trial based on the introduction of such materials to the jury. *See Stephens v. City of Dayton, Tennessee,* 474 F.2d 997 (6th Cir.1973) (new trial not necessary in personal injury case when juror told remaining jurors that he had seen plaintiff walking much better in the parking lot than in the courtroom).

As noted above, Defendants have alleged a number of instances in which extraneous prejudicial information was introduced to the jury—statements by Juror Gilligan indicating prejudgment of the case, communication of newspaper accounts of a settlement offer made to Plaintiff by the Defendant City of Dayton and informing some jurors that Plaintiff was expecting millions, statements by Juror Gunner as to the credibility of police officers, and a statement by Deputy Clerk of Courts Brice Mantel indicating that trial had been delayed one morning because settlement was being discussed between the parties. Based upon the evidence presented at the hearings held to investigate juror misconduct in this case (and on the affidavits of three regular jurors and an alternate juror to the extent that the competent, admissible evidence therein tends to provide fresher (in the sense of nearer to the event) recollections of the acts of misconduct than the testimony at the hearings), the Court finds that the following instances of introduction of extraneous information to the jury occurred:

1. Juror Gunner stated that he had had both good and bad experiences with police and law enforcement officers (as more specifically set forth above), and that the credibility of such officers should be judged in the same manner as that of any other individual (Transcript of *In Camera* Proceedings at 75–77, 80,

82, 84, 189, 225–28, 243–44, 259–64, 271–76, 290–99 and 301);

2. One or more jurors heard Juror Gilligan state that Plaintiff was expecting millions from the lawsuit (*Id.* at 72);

3. At least several jurors heard Juror Gilligan prior to deliberations state that in a previous case in which he had served as a juror the only issue was the amount of money damages and, on a separate occasion(s), state that a witness favorable to the Defendant was not credible (the alleged claim(s) of prejudgment of the case) (*Id.* at 24–25, 28, 44, 70, 74, 116, 168, 218–19, 258 and 320); and

4. Jurors White and Lancaster heard prior to and during deliberations statements made by Juror Gilligan concerning a news report of a settlement offer having been made by Defendant City of Dayton to the Plaintiff in the amount of $250,000 (*Id.* at 72–73, 78, 82–83, 217–18, 221 and 224) and a statement from Brice Mantel that trial had been delayed on one occasion due to the parties being engaged in settlement discussions (*Id.* at 69–70, 213 and 215–17). Juror Dinsmore heard Juror Gilligan's statement regarding the report of a settlement offer by the City of Dayton to Plaintiff during deliberations, but did not hear either Mr. Gilligan or Mr. Mantel make any reference to settlement prior to deliberations (*Id.* at 42, 45–46 and 55–57).[9]

The Court will separately review each of these incidents of introduction of extraneous information to the jury, in the order set forth above, in order to determine whether each incident was "entirely devoid of any proven influence or the probability of influence upon the jury's deliberations or verdict."

---

**9.** The Court notes that the testimony adduced at the *in camera* hearings also indicated that Mr. Mantel indicated to some of the jurors that the trial would last longer than anticipated and, immediately before the jury began to deliberate, that they should take a poll at the beginning of deliberations. *See* Transcript of *In Camera* Proceedings at 220 & 257–58. However, Defendant has not argued, and the Court does not find, that either of these acts of misconduct could have prejudiced the jury in its deliberations.

### 1. Statements of Juror Gunner

■ Turning first to the statements of Juror Gunner regarding his good and bad experiences with police and other law enforcement officials, assuming *arguendo*, that such statements are extraneous information,[10] the Court must find such information was devoid of any proven or probable influence upon the jury's deliberations. As noted above (*see supra* the Court's discussion of alleged perjury on voir dire), Mr. Gunner informed his fellow jurors during deliberations that he had undergone both good and bad experiences with police and other law enforcement officials, gave examples of each type of experience, and told his fellow jurors that the credibility of the police officers must be judged in the same manner as the credibility of any individual is judged. *See* Transcript of *In Camera* Proceedings at 259–64. Catherine White confirmed in her testimony that Mr. Gunner had told the jury of both his good and bad experiences with the police. *See id.* at 80. These statements were not made in an attempt to persuade the other jurors that because Mr. Gunner had undergone these bad experiences with police officers the Defendant in this case should be punished. Rather, Mr. Gunner used this information merely to urge the jury to follow the course that the Court's jury instructions had set for them, i.e., to judge each witness based upon the jurors' everyday means of determining whether a statement is worthy of belief. *See id.* at 259. Thus, the context of Mr. Gunner's statements to his fellow jurors about his past experiences with the police makes it improbable that these remarks had any proven or potential prejudicial effect upon those jurors. Moreover, the juror's answers to the interrogatories

---

**10.** The borderline between the common knowledge jurors are expected to bring to the deliberative process and extraneous influences is often very thin. *See Gault v. Poor Sisters of St. Frances Seraph of the Perpetual Adoration, Inc.,* 375 F.2d 539, 549 (6th Cir.1967). For the sake of insuring a complete analysis, the Court has assumed that Mr. Gunner's experiences with the police and other law enforcement officials constituted extraneous information brought to the jury's attention.

submitted to them indicated the opposite of the anti-police bias Defendant urges was inevitable from Mr. Gunner's stories—the jury found for the Defendant on Plaintiff's civil rights claim, specifically by finding that the supervisory policy of the City of Dayton's Police Department was not the moving force behind the deprivation of James Urseth's constitutional rights. Accordingly, the Court concludes that Defendant is not entitled to a new trial based upon Mr. Gunner's statements regarding his good and bad experiences with police and other law enforcement officials.

### 2. Gilligan Statement That Plaintiff Was Expecting Millions

▮▮▮ Turning to the statement of Juror Gilligan that Plaintiff was expecting "millions" from this lawsuit, see Transcript of In Camera Proceedings at 72, the Court must likewise find this statement devoid of either proven or probable prejudicial influence upon the jury's deliberations or verdict. In reaching this conclusion, the Court first notes that Mr. Gilligan's statement neither expressed nor implied a judgment as to the merits of that expectation on the part of the Plaintiff. Secondly, the Court notes that Plaintiff had made this expectation known throughout the trial by the testimony of numerous witnesses. Moreover, Plaintiff's counsel had emphasized it in his closing statement. Thus, if this statement was extraneous, it was not the only source of that information to the jury. Taking these facts together, the Court must conclude that Defendant is not entitled to a new trial on the basis of this statement by Mr. Gilligan.

### 3. Gilligan Statements Indicating Alleged Prejudgment of the Case

▮▮▮ Turning to those statements of Juror Gilligan that may have indicated a prejudgment of this case on his part, the Court notes that apparently two statements were made in the presence of other jurors. One statement, apparently made in the jury's seventh floor waiting area, indicated that it was an open and shut case—that money was the only question. This statement referred to a previous trial in which Gilligan had served as a juror, but may have been misconstrued by some jurors as referring to this case. See Transcript of In Camera Proceedings at 116 (Gilligan testimony) and 300 (Gunner testimony that Gilligan had served on other juries). Indeed, based upon all of the testimony given at the hearings in this matter, the Court concludes that Juror Dinsmore's statement in paragraph three of her affidavit that Mr. Gilligan had stated that it was "not going to be hard to come up with a verdict but only a decision as to the amount" was such a misunderstanding. However, even if Mr. Gilligan made this statement with reference to this case, the Court would find that statement lacking in proven or probable prejudicial influence based upon the analysis set forth below regarding Mr. Gilligan's other statements of alleged prejudgment. The other statement by Mr. Gilligan (which may have been repeated more than once) indicated that he believed, perhaps after the testimony of Col. Riley, that the police were "blowing smoke" or that evidence favorable to the Defendant lacked credibility. See id. at 24–25, 44 and 218–19. Each of these statements was apparently overheard by some of the jurors (Braemer,[11] Dinsmore[12] and

11. Alternate Juror Braemer, as he held the door for jurors exiting the courtroom, had the clearest impression of Mr. Gilligan's statement that police were "blowing smoke" or that they lacked credibility. However, Mr. Braemer stated that this comment occurred during the testimony of Col. Riley, Plaintiff's first witness. The Court is unable to understand how a statement that the police are just "blowing smoke" could be made before any of the police testified. (While Col. Riley was a former police officer, his testimony was strongly favorable to the Plaintiff, and thus Mr. Gilligan's remark could not have referred to him.) In any case, Mr. Braemer, as an alter-

nate, was not a part of the jury's deliberations, and he denies communicating Mr. Gilligan's statement to any of the other jurors. See Transcript of In Camera Proceedings at 28. Thus, the prejudicial effect of any statements communicated only to Mr. Braemer must have been nil.

12. While Juror Dinsmore was the most credible witness claiming that acts of misconduct occurred, her credibility with respect to whether Mr. Gilligan made statements indicating prejudgment of this case is diminished somewhat by her statement to a newspaper reporter imme-

Lancaster) but not by all of them at the same time. There is no evidence, nor does the Court believe after its examination of Mr. Gilligan,[13] that either comment was intended to sway the jury to Mr. Gilligan's point of view. The most likely prejudicial effect of such statements would have been to cause other jurors to prejudge the case and thereupon to become inattentive to the Defendant's evidence. However, there is no evidence that any juror upon hearing these statements was thereafter inattentive to or ignored evidence favorable to the Defendant as it was presented[14]—indeed, based upon its observation of the jury during the pre-deliberations phase of the trial and at those times during the deliberations (which lasted over the course of five days) in which the jury was brought into the open Court to recess for meals and for the evening, the Court finds that each of the jurors was attentive and outwardly most diligent in the performance of his or her duties during the entire course of the trial. The extended period of time during which deliberations occurred makes it additionally improbable that any juror was swayed by Mr. Gilligan's remarks during the course of trial into prejudging the case. Indeed, prejudgment of the case in favor of the Plaintiff is inconsistent with the answers given to the interrogatories submitted by the Court since those answers to interrogatories, as noted above, resulted in a judgment for the Defendant on Plaintiff's civil rights claim. In sum, taking these possible indications as to the effect of several members of the jury having heard Mr. Gilligan's statements of alleged prejudgment of the case, or statements which could have been interpreted by them as a prejudgment of the case (juror attentiveness, duration of deliberations and the finding for Defendant on Plaintiff's civil rights claim) as a whole, the Court must find that such statements were devoid of any proven or probable influence upon the jury's deliberations or answers to interrogatories.

### 4. Statements with Respect to Settlement Offers or Negotiations

 Finally, turning to extraneous information before the jury with respect to settlement offers or negotiations, the Court notes that it has found that Jurors Lancaster and White heard Mr. Gilligan, prior to their deliberations, report that a newspaper article had stated that the City of Dayton had made an offer of $250,000 to Plaintiff to settle the case. The Court has also found that Deputy Clerk of Courts Brice Mantel reported or stated (which report or statement was heard by these two jurors) that trial had been delayed one morning because the parties were engaged in settlement negotiations. Moreover, Juror Dinsmore, along with Jurors White and Lancaster, heard Juror Gilligan repeat his statements regarding the newspaper story reporting the Defendant's settlement offer during the course of deliberations.[15] While

---

diately after trial that "we came in with no preconceptions." Ms. Dinsmore testified that the contents of this article accurately reflected her statements at the time. *See* Transcript of *In Camera* Proceedings at 336–37. (The Court finds this statement admissible to challenge the credibility of Ms. Dinsmore in the hearings with respect to her testimony as to the existence of or the precise wording of statements allegedly indicating prejudgment made by Mr. Gilligan, but incompetent insofar as it is introduced as evidence of the mental states of the jurors).

**13.** Contrary to Defendant's argument that Mr. Gilligan was a clever, selectively forgetful, and therefore non-credible witness in the *in camera* proceedings, the Court finds Mr. Gilligan strong willed, honest and possessed of good intentions, but an individual whose credibility, at least insofar as it is dependent upon his recollection of past events, is somewhat suspect due to the

ravages of advancing age. He himself has admitted such limitations upon his memory. *See* Transcript of *In Camera* Proceedings at 140. In all essential respects, however, his testimony was corroborated by Mr. Gunner and other jurors.

**14.** Juror testimony as to their attentiveness or lack of same would not have been competent under Fed.R.Evid. 606(b). *See United States v. Tanner,* — U.S. —, ———, 107 S.Ct. 2739, 2745–50, 97 L.Ed.2d 90 (1987). However, such inattentiveness, had it existed, could have been shown by affidavits of counsel or others present at trial, because Rule 606(b) bars only the testimony of the jurors themselves regarding their mental states.

**15.** The Court notes, however, that according to Juror Dinsmore the Defendant's settlement offer was mentioned only *once* in the course of the

this information regarding settlement offers and negotiations was undoubtedly the most serious extraneous information brought to the jury's attention, the Court must conclude, in light of the jury's verdict, that such information must have been devoid of either proven or probable influence upon the deliberations or the jury's answers to the Court's interrogatories.

Initially, in considering the prejudicial effect that knowledge of settlement offers or negotiations might have upon a jury, the Court notes that a settlement offer or the fact of settlement negotiations is not direct evidence regarding the factual issues in a case. In other words, unlike the experimentation in *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 211–12 (6th Cir.1982) (in which a juror, during trial, examined his own home's aluminum wiring to determine whether it contained the defects plaintiffs claimed, and reported those tests to his fellow jurors), knowledge of a settlement offer does not directly tend to make more or less probable any factual element of Plaintiff's claim or Defendant's theory of defense. Rather, knowledge of a settlement offer or the fact of settlement negotiations might have four conceivable prejudicial effects upon a jury: it might be seen as a minimum amount below which a money judgment cannot be returned, the amount of the offer might be understood as setting a range or likely figure into which or at which a damages award should fall, it might be construed by the jury as an admission of liability by the party making the settlement offer, and/or it might be used as a lever to gain a compromise verdict.

Turning first to the possibility that the jury construed the settlement offer of $250,000 as a minimum amount below which recovery could not fall, the Court finds, even assuming a juror or jurors construed the $250,000 offer as such a minimum, that the very amount of the money damages awarded by the jury on Plaintiff's

wrongful death claims makes any such prejudicial effect of such misconduct extremely improbable. As noted above, the jury awarded Plaintiff $3,500,000, or fourteen times the amount of Defendant's reported settlement offer, on her wrongful death claim. While a damages award fourteen times the amount of the settlement offer does not show that jurors could not have considered the amount of the settlement offer as an amount below which recovery could not fall, such an award does prove that such an assumption had no influence on the amount of damages actually awarded.

Likewise, it is impossible that the jury understood the $250,000 offer as setting a range or likely figure within which or at which recovery should be granted. Again, the huge size of the damages award lead inevitably to the conclusion that an award arose out of considerations entirely distinct from the hypothetical possibility that the jury felt obligated to grant a recovery roughly equivalent to the amount offered by the Defendant.

Turning to the possibility that knowledge of a settlement offer and/or settlement negotiations was treated by the jury as an admission of guilt on the part of Defendant City of Dayton, the Court must again find that the jury's own answers to the interrogatories submitted to them make such a theory extremely improbable. For its deliberations, the jury was presented with specific interrogatories (twenty-five of them) which requested answers to specific factual questions, rather than ultimate conclusions on liability. The fact that the jury returned answers to interrogatories upon which this Court entered a verdict and judgment for the Defendant on Plaintiff's civil rights claim, and thus found for the Plaintiff only on the state law wrongful death claim, is strong evidence that the jury did not construe the settlement offer by the City of Dayton as an admission of

jury's deliberations which extended over portions of five days. *See* Transcript of *In Camera* Proceedings at 45. Neither Catherine White nor Patty Lancaster controverted this statement in their testimony. *See id.* at 72 (White) and 217–

18 (Lancaster). The lack of further discussion of the settlement offer during the jury's long deliberations is a further indication of the lack of probable prejudicial effect such information would have upon a "typical" juror.

guilt. The answers to the Court's interrogatories upon which a judgment for Defendant was entered on Plaintiff's civil rights claim are entirely inconsistent with a theory that the jury construed the offer of settlement as an admission of guilt by the Defendant City of Dayton. Specifically, the jury found that the City of Dayton had a supervisory policy which was likely to lead to the deprivation of individual's constitutional rights. The jury went on to find, however, that this supervisory policy was *not* the moving force behind the specific violation of the decedent James Urseth's civil rights. If the jury had considered the City of Dayton's settlement offer as an admission of guilt, there would be no logical reason for that jury, having just found that Defendant City of Dayton had a supervisory policy likely to deprive individuals of their constitutional rights, to find that such a supervisory policy was *not* the moving force behind the deprivation of James Urseth's constitutional rights. The Court can only conclude (when faced with such an inconsistency between an alleged admission of liability on the part of the Defendant and a jury finding that the Defendant's policy was *not* responsible for (i.e., was not the moving force behind) the deprivation of Mr. Urseth's constitutional rights) that the jury did not consider Defendant's offer of settlement and/or the fact of settlement negotiations between the parties to be an admission of liability on the part of Defendant City of Dayton.

Finally, the Court must find that it is just as improbable that knowledge of a settlement offer or of settlement negotiations could be used as a lever in this case in gaining a compromise verdict (i.e., a verdict in which one group of jurors gives in on the civil rights claim while the other group gives in on the wrongful death claim). The usual scenario involving a compromise verdict runs as follows: one group of jurors says the defendant is liable across the board, while another group of jurors says the defendant is not at all liable. As a compromise, they find the defendant liable but award a significantly smaller verdict than the plaintiff had sought. In the present case, the only possible compromise verdict that could have arisen would have been for some jurors to have given up their belief that Defendant was liable on Plaintiff's civil rights claim in order to persuade the other jurors to find for the Plaintiff on her wrongful death claim. However, it seems to this Court extraordinarily unlikely that a juror who felt that the Defendant City of Dayton had no liability at all would compromise that belief by returning answers to interrogatories resulting in a judgment for the Plaintiff (on her wrongful death claim only) for $3,500,000. It is inconceivable that a juror who believed the City of Dayton should not be held liable at all would agree to an award fourteen times greater than the amount of the settlement offer, even if that offer were to be used to try to convince that juror of the City of Dayton's liability.

The Court must therefore conclude that any extraneous information regarding settlement offers must have been entirely devoid of any proven or probable prejudicial influence upon a "typical" juror's deliberations or answers to interrogatories. *See Owen v. Duckworth,* 727 F.2d 643, 646 (7th Cir.1984).

Based upon the above reasoning, the Court must conclude that *none* of the extraneous information brought before the jury could have had any proven or probable prejudicial influence upon a "typical" juror's deliberations or answers to interrogatories. *See id.* Defendant's Motion for a New Trial, insofar as it is based on the impropriety of the extraneous information brought before the jury, will be overruled.

In sum, the Court has found that Defendant's Supplemental Motion for a New Trial is not well taken either insofar as it is based upon juror perjury on voir dire or insofar as it is based upon the prejudicial effect of extraneous information brought before the jury. Said motion will accordingly be overruled.

Having indicated that it will overrule Defendant's Supplemental Motion for New Trial (Doc. # 209), the Court notes that Defendant's Motion for New Trial or in the Alternative Remittitur (Doc. # 208) has not become moot. Because, as this Court has

previously noted, that motion makes a colorable argument for remittitur in this case, and because the Court finds that the Plaintiff's views as to how the jury's award of money damages is justifiable in light of the specific elements of damages set forth in Ohio wrongful death statute would be most useful in resolution of said motion, Plaintiff is hereby granted ten (10) days from receipt of this entry to file a memorandum in opposition thereto. Upon receipt of Plaintiff's memorandum in opposition, Defendant City of Dayton will have seven (7) days to file a reply memorandum.

### APPENDIX

Portions of juror affidavits found competent by the Court under Federal Rule of Evidence 606(b):

A. Edward C. Braemer:

1. I was an alternate juror on the case captioned *Anomi Urseth v. City of Dayton,* Case No. C–3–84–103.

2. Two days into the case, John Gilligan, a juror in this case, said that it was just a matter of how much money we were going to give her. He made this comment to me on the way in to the jury room while Mr. Riley was on the stand. He also said something to the effect that it was an open and shut case and that people out there, referring to the police officers, were just blowing smoke. This was long before all of the evidence had been submitted.

....

6. Patty Lancaster also indicated something to me to the effect that John Gunner indicated that this was the kind of thing that the police had done to his son in Tennessee.

B. Diane Dinsmore:

1. I was a juror duly empaneled by the federal court in the case captioned *Anomi Urseth v. City of Dayton,* Case No. C–3–84–103. I was not an alternate juror.

....

3. Early during the course of the trial, while evidence was still being presented,

John Gilligan, also a member of the jury, said during a break in the jury room something to the effect that it was "not going to be hard to come up with a verdict but only a decision as to the amount." ...

....

5. John Gunner stated during the deliberations, when discussing the first Interrogatory, that he knew that police could be corrupt because he had a bad experience with police once who had ripped him off of some jewelry. He also stated that his son had a bad experience in Tennessee with police.

6. I recall Mr. Gilligan mentioning during the deliberations about the fact that he had spoken with a coworker who had provided him with news accounts of the settlement offers. During the course of deliberations, the fact that the City had offered money to the Plaintiff was discussed. I do not recall the amount of the settlement being discussed.

C. Catherine White:

1. I was a juror duly empaneled by the federal court in the case captioned *Anomi Urseth v. City of Dayton,* Case No. C–3–84–103.

....

3. ... John Gunner, also a juror, stated that the police had ripped off one of his stores. He also stated something about his son having a bad experience with the police but said he, himself, had both good and bad experiences with the police in his jewelry business.

4. During the deliberations, I recalled that there had been earlier some conversation among the men in the seventh floor jury assembly room talking about the amounts of settlements. It was known that the City of Dayton had made an offer of $250,000 that had been rejected. Mr. Gilligan agreed during the deliberations that his wife had read this in the Enquirer the day before the jury was selected and it said that the Plaintiffs expected millions ...

....

D. Patty Lancaster:

1. I was a juror duly empaneled on the case captioned *Anomi Urseth v. City of Dayton,* Case No. C–3–84–103.

. . . .

7. Mr. Gilligan was talking about the verdict long before the case was submitted to us for deliberation. He stated something to the effect that this was the way it was going to be. There was something said that it was just a matter of money. He also talked to someone at work about the case during the trial and found out what the papers were reporting.

8. Mr. Gunner, also a juror on the panel, told us, at the beginning of the deliberations, that his store was ripped off once by the police and that the cops in Tennessee treated his son badly.

. . . .

10. During the course of trial, the fact that the City of Dayton had made a settlement offer came up by Mr. Gilligan.... Catherine White told me that she also heard the City had offered settlement money to Mrs. Urseth.